UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARET VALERIO and <br> JOHN VALERIO, <br>          Plaintiffs <br><br> v. <br><br><br> U.S. BANK, N.A., as Trustee for MASTR <br> Asset Backed Securities Trust, 2006-FRE2, <br> and <br> WELLS FARGO BANK, N.A., <br> d/b/a America's Servicing Company, <br>          Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )  Civil Action 10-10529-NMG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs move that this Honorable Court issue a temporary restraining order and, after hearing, a preliminary injunction, prohibiting defendants and their officers, employees, agents, attorneys, fiduciaries, representatives, assigns, and successors in interest from: (i) evicting or attempting to evict either plaintiff from the premises located at 105 Ledge Road, Seekonk, Massachusetts, and (ii) selling, conveying, transferring, assigning, alienating, pledging, hypothecating, or encumbering said property until the claims set forth in this action can be fully adjudicated on the merits. A proposed order is appended hereto as exhibit A.

### Introduction

Plaintiff Margaret Valerio is the mother of plaintiff John Valerio. In 1989, Margaret and her late husband, William J. Valerio – John's father - acquired the property

located at 105 Ledge Road, Seekonk, Massachusetts from William J. Valerio's parents, Anthony and Alice Valerio, taking title as tenants by the entirety.  Affidavit of John Valerio ("Pl.Aff."), ¶2; Affidavit of Kenneth D. Quat, Esquire ("Quat Aff"), exhibit A.  Following the death of William in 2005, John moved into the property to assist his mother, and in October, 2005, Margaret deeded the property to herself and John as joint tenants with rights of survivorship.  Pl.Aff., ¶2; Quat Aff., exhibit B.  In December, 2005, Margaret and John refinanced the property to generate funds to assist them with living expenses.  Pl.Aff., ¶3.  The lender in this transaction was Fremont Investment and Loan Company ("Fremont"), and the mortgage was placed in the name of Mortgage Electronic Registration Systems, Inc. ("MERS"), "acting solely as nominee for Lender and Lender's successors and assigns."  Pl.Aff., ¶3; Quat Affidavit, exhibit C.[1]  The interest rate of the loan was fixed for the first two years, and plaintiffs' intent was to sell the property during that time.  Pl. Aff., ¶3.  However, due to the collapse of the housing market plaintiffs were unable to sell, and when the interest rate adjusted upward in late 2007, they had difficult making the payments.  Pl.Aff., ¶3.   Therefore, in February, 2008, they began to explore a loan modification with the loan servicer, defendant Wells Fargo, operating under the name "America's Servicing Company."  Pl.Aff. ¶4.

   Plaintiffs complied with Wells Fargo's several requests for documents, only to learn in January, 2009 that it had mistakenly concluded that plaintiffs were no longer interested.  Pl.Aff., ¶4.  In early 2009 plaintiffs then sent Wells additional documents, but never received a response.  Pl.Aff., ¶5.  John Valerio had to call Wells Fargo himself

---

[1] In 2008, Fremont was found by a judge of the Superior Court to have engaged in a pattern of predatory lending practices in Massachusetts, a finding which was upheld by the Supreme Judicial Court. *Commonwealth v. Fremont Investment & Loan,* 2008 WL 517279 (Mass. Super. Feb. 26, 2008), *aff'd* 452 Mass. 733.

several times to obtain information, only to be told that certain documents had not been received or that additional documents were required. PlAff., ¶5. At one point, one of Wells Fargo's representatives told Mr. Valerio that the documentation was complete and that a modification decision was "pending," only to be told two weeks later by a different representative that the file was not complete and that all documents had to be re-submitted. Pl. Aff., ¶5.

In March, 2009, plaintiffs received foreclosure notices from U.S. Bank's attorneys stating that an auction sale would be held on April 2, 2009. Pl.Aff., ¶6. John Valerio immediately called Wells Fargo and was told this was simply "standard practice" and that the sale would not proceed so long as modification efforts were in process. Pl.Aff., ¶6. The foreclosure sale was in fact postponed three times. Pl. Aff., ¶6.

In early July, 2009, plaintiffs received a loan modification package from Wells Fargo. Pl.Aff. ¶7. The proposed modification required a down payment of over $9,000. Pl.Aff., ¶7. John Valerio called Wells Fargo and indicated that the modification terms were acceptable but that he and his mother would need more time to raise the down payment. He was told by a Wells Fargo representative to sign and return the documents and that he would be contacted later about the down payment. Plaintiffs followed these instructions. Pl.Aff. ¶7.

During the first week of August, 2009, plaintiffs received a second loan modification package which was the same as the first, followed a few days later by a letter from Harmon Law Offices indicating that the foreclosure sale had already occurred, which came as a total surprise to them. Pl. Aff., ¶8. John Valerio immediately called

Wells Fargo and was told that it was already working to have the sale reversed, that this could take a few weeks, and that plaintiffs were still in "modification mode." Pl.Aff., ¶8.

In November, 2009, U.S. Bank commenced summary process proceedings to evict plaintiffs from their home. Pl.Aff. ¶10. Having been advised by their summary process attorney that they did not have grounds to contest the eviction and that she could no longer provide representation, and having been told by Wells that the Bank would consider re-selling the property to plaintiffs, plaintiffs agreed to vacate the property by February 1, 2010. Pl. Aff., ¶10. A week later plaintiffs were informed that the Bank was not interested in selling the property back to them. Pl.Aff., ¶12..

Had plaintiffs not been misled about the status of the modification negotiations and foreclosure sale, one or both of them would have filed a chapter 13 bankruptcy petition, which would have stopped the sale and allowed them time to either sell the property or cure the arrearage. Pl.Aff., ¶15. At that time plaintiffs could have also raised the issue of U.S. Bank's authority to foreclose, as further described below.

Documents recorded with the Bristol County Registry of Deeds reflect that U.S. Bank formally commenced foreclosure proceedings in February, 2009, by filing a petition under the Servicemembers Civil Relief Act with the Massachusetts Land Court. Quat Aff., exhibit D. At the time of this filing, U.S. Bank did not have an interest in either the note or the mortgage, as the mortgage assignment was not executed until March 3, 2009. Quat Aff., exhibit E. The assignment by MERS to U.S. Bank purports to convey both the note and mortgage, stating that "[MERS} assigns said mortgage and the note and claim thereby" to U.S. Bank, N.A. but - as shown below - at most this document only assigned the security interest.

4

In this action, plaintiffs contend first that the foreclosure of their home conducted by U.S. Bank was invalid under Massachusetts law, and is therefore void, because U.S. Bank was not entitled to enforce the promissory note payable to Fremont. They further contend that the foreclosure sale should be voided because plaintiffs had been assured by U.S. Bank's agent, Wells Fargo, that a foreclosure sale would not occur while the parties were attempting to negotiate a loan modification. As demonstrated below, plaintiffs are reasonably likely to prevail on one or both of their claims, they will suffer irreparable harm should defendants be permitted to evict them and/or transfer the property prior to plaintiffs' claims being fully adjudicated on the merits, which harm would far outweigh any potential harm to defendants. Accordingly, the requested order should issue.

## **Argument**

As has been often recognized, "[t]he standard used by a district court considering a request for a temporary restraining order is the same standard used for determining whether to issue a preliminary injunction.´ *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 640 F.Supp. 1159, 1160 (D. Mass. 1986). The following four criteria are considered: (i) plaintiffs' likelihood of success on the merits; (ii) the potential for irreparable harm in the absence of relief; (iii) whether the harm which plaintiffs would suffer in the absence of relief would outweigh that which might result to defendants; and (iv) the effect, if any on the public interest. *Id.,* citing *LeBeau v. Spirito,* 703 F.2d 639, 642 (1st Cir. 1983). Ultimately, the purpose of preliminary injunctive relief "is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *Cryer v. Clark,* 2009 WL 6345768*1 (D.Mass. July 9, 2009), quoting *CMM Cable Rep., Inc. v. Ocean Coast Prop.,*

5

*Inc.,* 48 F.3d 618, 620 (1st Cir. 1995). For the following reasons, the issuance of a temporary restraining order as requested by plaintiffs is both warranted and appropriate.

I. **A RESTRAINING ORDER SHOULD ISSUE SINCE THERE IS A SUBSTANTIAL QUESTION WHETHER U.S. BANK WAS ENTITLED UNDER MASSACHUSETTS LAW TO ENFORCE THE PROMISSORY NOTE; AT A MINIMUM, PLAINTIFFS SHOULD BE AFFORDED A REASONABLE OPPORTUNITY TO CONDUCT DISCOVERY ON THIS ISSUE.**

The principle is well-settled that simply having the status of "mortgagee" does not provide a legal basis for foreclosure, because a mortgage only constitutes a security interest for an underlying obligation. Thus, a mortgage is without significance unless connected to the promissory note which it purports to secure:

> A mortgage loan consists of a promissory note and a security instrument, typically a mortgage or a deed of trust. When the note is split from the deed of trust, "the note becomes, as a practical matter, unsecured.

*In re Mitchell,* 2009 WL 1044368 *4 (Bankr.D.Nev. Aug. 19, 2008), quoting *Restatement (Third) of Property (Mortgages),* §5.4, Comment A (1997). A foreclosing entity, therefore, "must establish there has been a sufficient transfer of both the note and deed of trust," and "[w]here the mortgagee has 'transferred' only the mortgage, the transaction is a nullity and his 'assignee,' having received no interest in the underlying debt or obligation, has a worthless piece of paper." *Id.,* quoting 4 Richard R Powell, *Powell on Real Property,* §37.27[2](2000). As another court explained:

> The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust..

6

*Bellistri v. Ocwen Loan Servicing, LLC,* 284 S.W.23d 619, 623 (Mo.App. 2009). *See, also, Saxon Mortgage Services, Inc. v. Nillery,* 2008 WL 5170180 (N.D. Cal 2008)("for there to be a valid assignment, there must be more than just assignment of the deed [of trust] alone; the note must also be assigned"); *In re Vargas,* 396 B.R, 511, 517 (Bankr.C.D.Cal. 2008) quoting *Carpenter v. Longan,* 83 U.S. 271, 275 (1872) ("[w]hile the note is 'essential,' the mortgage is only 'an incident' to the note"); *Landmark Nat'l Bank v. Kesler,* 289 Kan. 528, 540 (2009)("in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable.").

The promissory note signed by plaintiffs is a negotiable instrument governed by Article 3 of the Uniform Commercial Code, codified in Massachusetts as Chapter 106 of the General Laws. As such, enforcement rights are defined by the Code. The note may only be enforced by: "(i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to section 3-309 or subsection (d) of section 3-418." G.L.c. 106, §3-301. The criteria for acquiring enforcement rights are set forth in other sections of the Code.[2]  *See,* generally, *First Nat'l Bank v. North Adams Hoosac Sav. Bank,* 7 Mass. App. Ct. 790, 796 (1979).

---

[2] Thus, "holder" is defined as "the person in possession if the instrument is payable to bearer, or in the case of an instrument payable to an identified person, if the identified person is in possession." G.L. c. 106, §1-201(20). The specific actions which must be taken to confer "holder" status or "the rights of a holder" are found in G.L. c. 106, §3-201 ("Negotiation") and G.L. c. 106, §3-203 ("Transfer of Instrument – Rights Acquired by Transfer"). Section 3-201 provides that where "an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder." The rules governing indorsements are set forth in sections 3-204, 3-205, and sections 3-206 of the Code. Section 3-203 provides that "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving the person receiving delivery the right to enforce the instrument."

7

It is therefore axiomatic that an assignment of the mortgage alone does not transfer ownership of the note. In *Federal Deposit Ins. Corp. v. Houde,* 90 F.3d 600 (1st Cir. 1996), the FDIC sued to foreclose on a mortgage which had been granted by the borrowers to the Maine National Bank. In order to determine whether it had authority to enforce the underlying note, the Court applied Maine's version of the U.C.C., which in all material respects is identical to that of Massachusetts. Because it was not a holder, "the FDIC had to show, as a prerequisite to enforcing the Note against the [homeowners], that it was a transferee in possession entitled to the rights of a holder," which meant it "was required (1) to prove a sufficient transfer from a holder (here MNB, to which the Note was made payable by the [plaintiffs] to the FDIC in its present capacity as receiver of NMNB, and (2) to produce the Note at trial." 90 F.3d at 605. The FDIC was unable to do so and judgment for the homeowners was affirmed. *Id.,* at 608.

In the instant matter, it is particularly unlikely that U.S. Bank acquired any rights to enforce the promissory note by the time of the foreclosure sale on August 4, 2009. The note was payable to Fremont but the mortgagee was named as MERS in the capacity of "nominee" for Fremont, and MERS never possessed or had any rights to, or interest in, the promissory note. MERS is simply "an electronic registry to track the transfer of ownership interests and servicing rights in mortgage loans." *In re Huggins,* 357 B.R. 180, 183 (Banr.D.Mass. 2006). *See Mortgage Electronic Registration System, Inc. v. Southwest Homes of Arkansas,* 2009 Ark. 152, 301 S.W.3d 1 (Ark. 2009)("MERS asserts to be a corporation providing electronic tracking of ownership interests in residential real property security instruments"). In court proceedings, MERS acknowledges that "it does not own the promissory notes secured by the mortgages and has no right to payments

made on the notes . . . it merely 'immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur.'" *Mortgage Electronic Registration Systems, Inc. v. Nebraska Dep't of Banking & Finance,* 270 Neb. 529, 704 N.W.2d 784, 787 (Neb. 2005).   Indeed, "MERS may not prosecute a mortgage foreclosure action in its own name as nominee of the original lender because it lacks ownership of the note and mortgage at the time of the prosecution of the action." *LaSalle Bank, N.A. v. Lamy,* 2006 WL 2251721 *1 (N.Y.Sup. Aug. 7, 2006). *See Landmark,* 289 Kan. At 541, 216 ("If MERS is only the mortgage . . . it does not have an enforceable right").  Accordingly, any right of U.S. Bank to enforce the note could not have resulted from the mortgage assignment from MERS to U.S. Bank.  Any such right could have only resulted from actions taken by persons or entities other than MERS.

A review of the case law reveals that such actions were unlikely to have occurred here.  In *In re Wells,* 407 B.R. 873 (Bankr.N.D.Ohio 2009), the homeowners had signed a note to Aegis Lending Corporation and a mortgage to MERS as "nominee" for the lender.  MERS then executed a mortgage assignment to U.S. Bank which, like the assignment here, contained language purporting to also assign the note.  The Court held squarely that this assignment "did not transfer the right to enforce the note to U.S. Bank." *Id.,* at 880.  The Court explained that under Ohio law "the note must be negotiated in accord with Ohio's version of the Uniform Commercial Code," and therefore "[a]n attempt to assign a note creates a claim to ownership, *but does not transfer the right to enforce the note." Id.*(emphases supplied).  Similarly, in *Bellistri,* the lender was BNC Mortgage Inc. and the mortgage was given to MERS as nominee for the lender.  The Court found "no evidence in the record or the pleadings that MERS held the promissory note or that BNC

9

gave MERS the authority to transfer the promissory note. It therefore concluded that "MERS could not transfer the promissory note; therefore the language in the assignment of the deed of trust purporting to transfer the promissory note is ineffective. MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force." 284 S.W.3d at 624 (citations omitted). And, in *Lamy,* the plaintiff bank was found to lack standing to foreclose where its claim was predicated solely on a mortgage assignment from MERS. 2006 WL 2251721 at **2-3.

Accordingly, there are substantial questions regarding U.S. Bank's authority on August 4, 2009 to have conducted a foreclosure sale of plaintiffs' home, and a temporary restraining order should issue so that, at a minimum, plaintiffs can conduct reasonable discovery into relevant events and transactions.

## II. THE COURT HAS EQUITABLE DISCRETION TO VOID THE FORECLOSURE SALE SHOULD IT BE ESTABLISHED AT TRIAL THAT DEFENDANTS ENGAGED IN THE MISCONDUCT ALLEGED BY PLAINTIFFS.

The facts alleged by John Valerio indicate that at the time of the foreclosure sale, all parties understood that they were in "modification mode" and that a sale would not occur until plaintiffs had a further opportunity to finalize a loan modification. Pl.Aff., ¶¶7-8. Indeed, even after the foreclosure sale occurred Wells Fargo acknowledged to plaintiffs that it had been conducted in error and that steps were already being taken to reverse it. Pl.Aff., ¶8. The principle is well-settled that "[a]greements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so." *Freedman v. Walsh,* 331 Mass. 401, 406 (1954). It is equally axiomatic that equitable relief is often appropriate where ownership of real estate is in issue. *Roxse Homes, Inc. v. Roxse Homes Ltd. Partnership,* 83 B.R. 185, 188

(D.Mass. 1988)(affirming award of specific performance).  *See,* also, *Burlington Landmark Assoc., LLC v. RHI Holdings, Inc.,* 27 F.Supp.2d 95 (D. Mass. 1998); *Sytchov v. Eon,* 2006 WL 3492159*12 (Mass. Super. Nov. 13, 2006), citing *Raynor v. Russell,* 353 Mass. 366, 367 (1967)(ordering specific performance).  Consequently, should plaintiffs prove their allegations at trial, the Court would be well within its equitable discretion to restore the parties to the positions they occupied prior to defendants' misconduct.

## Conclusion

For the foregoing reasons, plaintiffs have demonstrated that: (i) there is a substantial likelihood they will prevail on one or more of their claims; (ii) they will suffer irreparable harm unless the requested relief is ordered; (iii) the harm which plaintiffs will suffer if the requested relief is not ordered outweighs any harm which might result to defendants; and (iv) there will be no adverse effect to the public from ordering the requested relief.  Accordingly, the instant motion should be granted.

> MARGARET VALERIO
> JOHN VALERIO,
> Plaintiffs, by:
>
> */s/Kenneth D. Quat*
> BBO #408640
> QUAT LAW OFFICES
> 678 Massachusetts Avenue, Suite 702
> Cambridge MA 02139
> (617) 492-0522
> kquat@quatlaw.com

## **Certificate of Service**

On May 18, 2010, copies of the foregoing were served via electronic mail through the Court's ECF system on all registered participants, and via first class mail, postage prepaid, on all parties and interested persons listed as non-registered participants.

*/s/Kenneth D. Quat*